# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

JASMINE CONNERS                                                                                    PLAINTIFF

V.                                      CASE NO. 4:09CV00024-BD

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration                                                                     DEFENDANT

## MEMORANDUM OPINION AND ORDER

Plaintiff Jasmine Conners has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"). For reasons that follow, the decision of the Administrative Law Judge ("ALJ")[1] is affirmed.

## I.      Procedural History:

Plaintiff filed an application for SSI benefits on April 21, 2006. Plaintiff alleges she became disabled on March 13, 2005, as a result of mental impairment.[2] The ALJ held a hearing on March 20, 2008, and Plaintiff appeared with her attorney David Hendrix. The ALJ received testimony from Plaintiff; Plaintiff's aunt and former guardian;

---

[1] The Honorable Don Curdie, Administrative Law Judge.

[2] At the administrative hearing, Plaintiff's representative amended the alleged onset date to March 13, 2005. (Tr. 610) This date immediately follows the most recent prior determination of the Commissioner to deny disability benefits to Plaintiff. (Tr. 343-349)

Christine McClina; and vocational expert Charles Turner ("VE").[3]  On May 30, 2008, the ALJ issued a decision denying Plaintiff benefits.  (Tr. 13-32)  Plaintiff filed the current Complaint for Review of Decision (docket entry #2) on January 14, 2009.

## II. <u>Background:</u>

At the time of the hearing, Plaintiff was a 19-year-old female with an eighth grade education.  She had never attempted employment and had no past relevant work experience.  (Tr. 594)

Plaintiff was under the age of eighteen at the time of the filing of the application for SSI.  She reached the age of majority on March 14, 2007, prior to the hearing and decision issued by the ALJ.  Plaintiff notes that the ALJ correctly evaluated her application under both the adolescent and adult standards for disability (#12).  While Plaintiff "does not concede the correctness of the ALJ's decision concerning the adolescent standards," she does not allege any error in the ALJ's determination regarding the adolescent standard (#12, fn. 1).  Instead, Plaintiff alleges the ALJ erred when deciding, under the adult standard, that Plaintiff could perform a significant number of jobs that exist in the national economy.

---

[3] It appears that the beginning of the administrative hearing was not recorded or transcribed for the record.  (Tr. 589-611)  Neither party has asserted that information material to this Court's review was omitted from the transcript.

### III. Findings of the ALJ:[4]

The ALJ followed the required five-step sequential analysis set out in the social security regulations, 20 C.F.R. § 416.920, finding that since Plaintiff attained the age of eighteen: (1) she had not engaged in substantial gainful activity; (2) she continued to suffer from "severe impairments" as that term is interpreted for purposes of the Social Security Regulations; (3) Plaintiff did not have an impairment, or combination of impairments, that rose to the level of severity for any impairment listed in Appendix 1 to Subpart P, Regulation No. 4; (4) she did not have any past relevant work; but (5) Plaintiff retained the residual functional capacity ("RFC") to perform the full range of work at all exertional levels with only nonexertional impairments. At step five, the ALJ found that a significant number of jobs existed in the economy which Plaintiff was capable of performing.

Plaintiff contends the ALJ's finding that she could perform a significant number of jobs that existed in the national economy is not supported by substantial evidence. Plaintiff does not allege any specific errors of law. The Defendant argues that the ALJ's decision is supported by substantial evidence because: (1) the ALJ properly assessed Plaintiff's RFC; and (2) the ALJ presented the VE with a properly phrased hypothetical.

---

[4] The Court has reviewed the Commissioner's determination under the adolescent standard for disability and finds the determination was supported by substantial evidence in the record. Plaintiff does not contest the adolescent determination. Accordingly, the Court will address only Plaintiff's allegation of error under the adult standard.

## IV. Legal Analysis:

In reviewing the ALJ's decision, this Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g). This review function is limited, and the decision of the ALJ must be affirmed "if the record contains substantial evidence to support it." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003). "Substantial evidence is less than a preponderance but enough so that a reasonable mind could find it adequate to support the decision." *Id.* Evidence that both supports and detracts from the ALJ's decision must be considered, but the decision cannot be reversed "merely because there exists substantial evidence supporting a different outcome." *Id.* "Rather, if, after reviewing the record, . . . it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, we must affirm the decision of the [ALJ]." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000) (citations and quotations omitted). Thus, the Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997); *see also*, 42 U.S.C. § 405(g).

## A. Plaintiff's Residual Functional Capacity:

The ALJ bears the initial responsibility for assessing Plaintiff's RFC. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). Plaintiff's RFC is what she can do despite her limitations. 20 C.F.R. § 416.945 (2003). In determining Plaintiff's RFC, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that Plaintiff can perform in a work setting, after giving appropriate consideration to all of her impairments. *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996). The ALJ must determine the Plaintiff's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and Plaintiff's own descriptions of her limitations. *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

The ALJ determined that Plaintiff maintained the RFC to perform a full range of work at all exertional levels with only nonexertional impairments. (Tr. 28-30) The ALJ found no physically limiting impairments. Mentally, the ALJ determined that Plaintiff was limited to a work environment where interpersonal contact is incidental to the tasks performed, the complexity of tasks is learned and performed by rote, with few variables, requiring little individual judgment, and with simple, direct, and concrete supervision. (Tr. 28)

1. **Physical Residual Functional Capacity:**

The record contains substantial evidence to support the ALJ's physical RFC determination. Plaintiff did not allege any physical limitations in her disability related filings. (Tr. 79) At the administrative hearing, she stated that she could not sit for long periods of time because she liked to move around. (Tr. 595) Plaintiff stated that she recently suffered a minor injury to her left knee. (Tr. 595) Plaintiff also complained of cramping in her back when lifting heavy objects. Plaintiff had not sought treatment for her back. (Tr. 596)

It appears Plaintiff never alleged disability from, or sought treatment for, a physical impairment, and none of the medical records evidence a physical impairment. Accordingly, the ALJ properly determined Plaintiff could physically perform a full range of work at all exertional levels.

2. **Mental Residual Functional Capacity:**

The record shows, and the ALJ found, that Plaintiff had some limitations in her mental functioning. Plaintiff's difficulties in school evidenced a limited ability to read. She had additional deficiencies in arithmetic and spelling. (Tr. 369) Plaintiff, however, did not have significant problems concentrating on class work or staying on task. (Tr. 369-370)

In early adolescence, Plaintiff had friends and the ability to make new friends. She generally got along with her teachers. Plaintiff, however, did not get along with her aunt or siblings. (Tr. 401) Plaintiff could take care of her personal hygiene and help around the house. Plaintiff could even use public transportation by herself. (Tr. 402)

Early cognitive testing showed Plaintiff had borderline intellectual functioning, with a full scale IQ of 74. (Tr. 557) It was noted, however, that the test results underestimated Plaintiff's abilities because she was not taking her prescribed medications. (Tr. 554-555) Later cognitive testing showed similar results, also while Plaintiff was not taking her medication. (Tr. 167-174)

Plaintiff underwent a Consultative Examination at United Family Services on November 15, 2004. (Tr. 146-150) In addition, Plaintiff engaged in therapy at United Family Services from November 15, 2004, until September 30, 2005. (Tr. 151-166)

Plaintiff's initial diagnoses were depressive disorder, attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder, and borderline intellectual functioning, with an assigned Global Assessment of Functioning ("GAF") score of 54.[5] (Tr. 149) Although social difficulties were noted, Plaintiff occasionally babysat on the weekends to earn money. The examination showed "no major medical or mental health problems" at

---

[5] The Diagnostic and Statistical Manual of Mental Disorders (4th ed.) (DSM-IV), published by the American Psychiatric Association, states that a GAF of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (DSM-IV 32).

that time. (Tr. 148) Plaintiff had glasses, but refused to wear them. She was prescribed Adderrall, but refused to take it. (Tr. 148) Monthly therapy reports showed some progress, with GAF scores ranging from 45 to 55.[6] (Tr. 151-166)

Plaintiff attended therapy at Arkansas Behavioral Health Care from March 8, 2006, until October 23, 2007. (Tr. 183-235) She attended individual and family counseling sessions for depressive disorder and ADHD. (Tr. 197) Plaintiff's problems were being defensive, easily offended, and paranoid, with a history of low self-esteem and abandonment by her parents. (Tr. 183-235) During this time, Plaintiff was taking courses at Job Corps while attempting to earn a General Educational Development certificate ("GED"). Plaintiff was admitted to BridgeWay after she acted "really badly" at Job Corps, refused to take her medication, and threatened suicide. (Tr. 206, 242)

Plaintiff was placed in BridgeWay for inpatient treatment from August 29, 2007, until September 4, 2007, under the supervision of Dr. Richard Owings. (Tr. 236-332) At the time of her admittance, Plaintiff was prescribed Abilify and Focalin. Dr. Owings discontinued Focalin and prescribed a regimen of Ability and Prozac, which Plaintiff tolerated well. (Tr. 237, 243) Plaintiff showed fair judgment and insight, linear and goal-oriented thought processes, average intelligence, and the ability to concentrate and recall information. (Tr. 239, 243) Dr. Owings' preliminary impression was major depressive

---

[6] A GAF of 41 to 50 indicates "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" (DSM-IV 32).

8

episode, single. (Tr. 240) Plaintiff's admission GAF score was 20.[7] (Tr. 241) No additional GAF scores were assigned in progress reports or at discharge.

Plaintiff repeatedly expressed a desire to return to Job Corps, at one point voicing concern that she would get behind in her classes. (Tr. 318) Dr. Owings believed Plaintiff had the ability to participate in Job Corps. (Tr. 240) Dr. Owings expressed some concern with Plaintiff's stated goal to get on disability. (Tr. 237, 294) Dr. Owings encouraged Plaintiff to use Job Corps to gain skills for employment. (Tr. 237, 294) After two days of therapy, Plaintiff's stated goal was to return to Job Corps, get her GED certificate, and find employment. (Tr. 296)

On September 4, 2007, Plaintiff was discharged to Job Corps, where she resided at the time. Plaintiff's prognosis upon discharge was "[f]air based on compliance and severity of illness." (Tr. 241) Plaintiff repeatedly stated that she was not suicidal. After discharge from BridgeWay, Plaintiff attended two therapy sessions at Arkansas Behavioral Health Care on October 2, 2007, and October 9, 2007, and stated her intent to get out of Job Corps. (Tr. 201, 202) Plaintiff saw Dr. Haroon for medication management and complained of sleepiness. Dr. Haroon adjusted Plaintiff's doses of medication. (Tr. 200, 203, 204, 205) It appears Plaintiff did not seek therapy, treatment, or medication management after October 23, 2007.

---

[7] A GAF of 11 to 20 indicates "some danger of hurting self or others (*e.g.*, suicidal attempts without clear expectation of death; frequently violent; manic excitement)" (DSM-IV 32).

Plaintiff was hospitalized in Baptist Health Medical Center from January 2, 2008, until January 9, 2008, under the supervision of Dr. Greg Kaczenski. (Tr. 333-335) The ALJ held the administrative record open after the hearing so that Plaintiff could provide the records for this hospitalization. (Tr. 598)

Dr. Kaczenski diagnosed Plaintiff with schizophrenia, undifferentiated type. (Tr. 333) Upon hospitalization, Plaintiff had a GAF score of 20.[8] She reported being off her medications since August, 2007. During hospitalization, Plaintiff underwent supportive interventions, group therapy, and occupational therapy. (Tr. 333) No progress reports were provided for Plaintiff's therapy.[9] No subsequent or discharge GAF scores were provided. Dr. Kaczenski did not diagnose Plaintiff with her previous diagnoses of depressive disorder, ADHD, oppositional defiant disorder, or borderline intellectual functioning. (Tr. 335) There is little explanation and no clinical or diagnostic testing to support Dr. Kaczenski's diagnosis.

On January 9, 2008, Plaintiff was discharged with no restrictions on her activities. (Tr. 333) She was instructed to follow up with Centers for Youth and Family on January 25, 2008. No follow-up documents appear in the record. Plaintiff testified that she was

---

[8] A GAF of 11 to 20 indicates "some danger of hurting self or others (e.g., suicidal attempts without clear expectation of death; frequently violent; manic excitement)" (DSM-IV 32).

[9] The "progress record" provided by Plaintiff is one page and pertains only to January 2, 2008, the first day of Plaintiff's hospitalization. (Tr. 335)

unable to find transportation to her follow-up appointments. (Tr. 592) Plaintiff, however, had been able to use public transportation independently since at least thirteen years of age. (Tr. 402)

It is difficult to determine the impact of Plaintiff's GAF scores on her RFC. The record shows only two assessed GAF scores between September 30, 2005, and March 20, 2008, the date of the administrative hearing. Both GAF scores were 20, which is extremely low. (Tr. 241, 333) Both assessments were made when Plaintiff was noncompliant with medication, at an initial assessment upon hospitalization, and by doctors who had no previous interaction or treatment history with Plaintiff.[10] These assessments appear to represent temporary low points in Plaintiff's functioning.[11]

The ALJ noted Plaintiff's failure to take prescribed medication or consistently seek treatment. Plaintiff takes issue with the ALJ's suggestion that she would have a higher level of functioning if she were medically compliant. The record, however, clearly shows Plaintiff's improvement when compliant with prescribed medication. Plaintiff even testified that she did not have trouble getting along with others when she took her prescribed medication. (Tr. 593)

---

[10] Plaintiff acknowledged as much by attempting to discredit some of Dr. Owings' progress remarks because of his "limited knowledge of [Plaintiff's] history" (#12, p. 9-10).

[11] Dr. Owings encouraged Plaintiff to use Job Corps to gain skills for employment, instead of seeking disability. (Tr. 237, 294) Clearly, a person with a consistent assessed GAF score of 20 would not be employable.

Plaintiff contends the ALJ failed to consider why Plaintiff was noncompliant. Plaintiff stated that her medication made her feel funny, dizzy, and sometimes sleepy. (Tr. 592, 598) When noncompliant, Plaintiff would sleep until 1:00 or 2:00 in the afternoon. (Tr. 604) When Plaintiff complained about the side effects of her medication, Plaintiff's doctors would switch medication or adjust the dosages. Plaintiff's former guardian, Ms. McClina, testified that part of the reason for Plaintiff's failure to take her medication was that she did not want her friends to know she needed medication. (Tr. 603)

Ultimately, the ALJ determined that Plaintiff was limited to a work environment where interpersonal contact is incidental to the tasks performed, the complexity of tasks is learned and performed by rote, with few variables, requiring little individual judgment, and with simple, direct, and concrete supervision. (Tr. 28) Although some evidence could support a different outcome, the ALJ relied on enough evidence in the record that a reasonable mind could find adequate to support the decision. See *Edwards*, 314 F.3d at 966 (substantial evidence is enough that a reasonable mind could find it adequate to support the decision; a Court cannot reverse the decision merely because substantial evidence exists supporting a different outcome).

At the administrative hearing, Plaintiff testified that her hospitalizations resulted from disruptive behavior and a failure to get along with others. (Tr. 591) The administrative record evidences Plaintiff's defensiveness and conflict with peers. With

few exceptions, however, Plaintiff was cooperative with therapists and doctors. The ALJ's determination that Plaintiff was limited to a work environment where interpersonal contact is incidental to the tasks performed adequately addressed Plaintiff's limited ability to interact with others when noncompliant with prescribed medication.

It appears when medically compliant, this limitation is unnecessary. Plaintiff testified that she did not have trouble getting along with others when she took her medication as prescribed. (Tr. 593) If an impairment can be controlled by treatment or medication, it cannot be considered disabling. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993).

The ALJ limited Plaintiff to jobs where the complexity of tasks is learned and performed by rote, with few variables, requiring little individual judgment. Substantial evidence in the record supports the finding that Plaintiff retained at least this limited ability. The record shows that during therapy, Plaintiff's cognition and thought processes were intact and she was generally focused or attentive. (Tr. 243, 301, 302, 306, 307, 311, 312, 315, 316, 318, 319, 322) Plaintiff described her limitations in this area as being able to remember only one thing, instead of two. (Tr. 593) Ms. McClina testified that Plaintiff could remember to do two things, but not three. (Tr. 604) Plaintiff testified that part of her problem was that she did not want to do certain things until she was told she had to. (Tr. 593, 595)

At the time of the administrative hearing, Plaintiff spent her days at home watching television and using the computer. (Tr. 594) She would sleep until 1:00 or 2:00 in the afternoon. (Tr. 604) She testified that she would spend all day on Facebook, a social networking website. (Tr. 599) Plaintiff would send, receive, read, and respond to email from friends. (Tr. 600) She was also able to shop for groceries. (Tr. 597)

The record shows that Plaintiff had little difficulty engaging in tasks she wanted to engage in, even when noncompliant with prescribed medication. The ALJ's finding that Plaintiff could learn and perform repetitive tasks with few variables and little individual judgment is easily supported by the record.

The ALJ's final nonexertional restriction was limiting Plaintiff to jobs with simple, direct, and concrete supervision. (Tr. 28) During therapy, Plaintiff was consistently able to follow directives and verbalize her understanding of instructions. (Tr. 300, 303, 308, 309, 310, 313, 317, 320, 321, 323) The lack of ambiguity in supervision could also lessen potential conflict between Plaintiff and an employer. The record does not seriously call into question Plaintiff's ability to comply with simple, direct, and concrete directives, even when noncompliant with prescribed medication.

**B.  Vocational Evidence and Significant Number of Jobs in the Economy:**

If Plaintiff cannot perform her past relevant work, the ALJ must find that a significant number of jobs exist in the economy which Plaintiff was capable of

performing.[12] In general, if Plaintiff suffered from nonexertional impairments that limited her ability to perform a full range of work, the ALJ would be required to utilize testimony of a VE. *Groeper v. Sullivan*, 932 F.2d 1234, 1235 n. 1 (8th Cir. 1991). In order for the VE's testimony to constitute substantial evidence, it must be in response to a properly phrased hypothetical question which accurately describes Plaintiff's limitations. *Hunt v. Barnhart*, 250 F.3d 622, 625 (8th Cir. 2001).

The ALJ found that Plaintiff's nonexertional impairments limited her to a work environment where interpersonal contact is incidental to the tasks performed, the complexity of tasks is learned and performed by rote, with few variables, requiring little individual judgment, and with simple, direct, and concrete supervision. (Tr. 28) Accordingly, the ALJ called a VE to provide occupational evidence. (Tr.608-610) The ALJ accurately described Plaintiff's limitations in a legally sufficient hypothetical question posed to the VE. (Tr. 608-609) See *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (hypothetical is sufficient if it sets forth the impairments accepted by the ALJ as true); see also Section A., *supra*.

The VE testified that an individual with Plaintiff's limitations could perform light exertion, unskilled jobs as a maid or hotel cleaner.[13] (Tr. 609) While there is no bright

---

[12] Plaintiff did not have any past relevant work.

[13] At the time of the hearing, there were approximately 125,000 of these jobs regionally, and 880,000 in the United States.

line rule regarding the number of jobs in the economy, it appears the Commissioner comfortably met his burden in this respect. See *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988)(500 jobs were a legally sufficient significant number to meet the Commissioner's burden). Accordingly, the Commissioner met his burden of showing that a significant number of jobs existed in the economy which Plaintiff was capable of performing.

V.     **Conclusion:**

There is substantial evidence in the record to support the Commissioner's denial of benefits to Plaintiff. It appears, as the ALJ recognized, that Plaintiff suffered at least one severe impairment. There is sufficient evidence in the record, however, to support the ALJ's assessment that Plaintiff retained the capacity to perform a significant number of jobs in the national economy. Accordingly, Plaintiff's appeal is DENIED. The Clerk is directed to close the case.

IT IS SO ORDERED this 9th day of March, 2010.

_____
UNITED STATES MAGISTRATE JUDGE